Mr. Anding. Good morning. John Anding on behalf of the appellant in this case. We are here in a diversity action that was tried under Michigan law. We seek reversal of the district court's failure to calculate prejudgment interest in accordance with the substantive laws of the state of Michigan, both under its statutory scheme that governs this issue as well as in accordance with the Michigan Supreme Court's interpretation of that statute, which by the way this court cited in its very first opinion in this case the unpublished opinion issued in August 7th of 2006. Well as we all know there have been a number of judgments in this case. It's been up and down at least two, maybe three times. Wasn't it clear before the October 2007 decision by this court that what the court was doing was non-protonct to the December 2003 date? Wasn't that apparent throughout this proceeding? Non-protonct as the court defined it, meaning that it was calculating the interest as of a date. Yeah. And that's what, that's the language that it used. In other words, in its October... Hasn't this been a known fact that this is what the judge was doing in terms, planned to do, or was doing in terms of the calculation? In terms of establishing a line of demarcation between pre and post judgment interest? Is that the question? Well, yeah. No, absolutely not. The only thing the judge has done in the course of this case is in April of 2004, entered a judgment, non-protonct, that basically calculated the pre-judgment interest through December 4th, 2003. Right. Then, in connection with our request, subsequent to the first appeal, in connection with our request to increase the bond, he issued an opinion. He actually issued an order as of October of 2006 in which, and that's at Appendix A193, in which the judge recognized that pre-judgment interest continued to accrue after December 4th, 2003, and calculated it up through October 30th, 2006, resulting in a judgment amount of $38,500,000. Where is that in the appendix? A193. The fact is that the underlying amount of the judgment put aside pre-judgment interest was established at this early date, and despite the two appeals, that amount didn't change, correct? The amount of the underlying judgment actually was changed in this sense, sir. April of 2004, the judge entered a judgment that included the vert amount along with a calculation of pre-judgment interest, which this court then vacated in August of 2006, vacated the- Yeah, but I don't think you're answering my question. I'm not talking about the judgment including pre-judgment interest. I'm talking about the judgment excluding pre-judgment interest. The judgment excluding pre-judgment interest didn't change. That's correct? Using your definition, Judge, that's correct, but I don't believe you can bifurcate the concept of judgment in that fashion. The verdict amount did not change. The judgment amount did change. Well, the judgment amount changed, but only because the amount of pre-judgment interest changed. Only because this portion of the judgment that included a calculation of pre-judgment interest. Okay, but under the Kaiser case in the Supreme Court, we don't look to the judgment including pre-judgment interest. We look to the judgment excluding pre-judgment interest, don't we? If the court- Are you now referencing the meaningfully ascertained? Yeah. Judge, I would agree with you that for purposes of meaningfully ascertained, that the original verdict satisfied that test. But of course, we don't get to meaningfully ascertained because that's a 1961 concept. And that was the problem with the district court's analysis. It abandoned the area requirement that you look first to substantive law to determine what the pre-judgment interest was that the plaintiff was entitled to. Suppose we were to reject that and we were to say that meaningfully ascertained under the Kaiser case is the correct standard for the cutoff date for pre-judgment interest and for the start date for post-judgment interest. Where do you stand then? Do you have any arguments as to why you should prevail? Yes, I do. Assuming you were to take that position, which I would argue was wrong under Erie, but assuming you were, Scott's decision, which is a 2005 Sixth Circuit opinion, which comes after the transmatic decision of this court, which looked at Sixth Circuit law at that earlier point. The Scott's decision says that you may use any judgment that ascertains damages, which would include any of the judgments that were entered in this case. But most importantly, that the policy behind pre-judgment interest and behind pre- and post-judgment interest dictates the equities approach that requires use of a later judgment, where the pre-judgment interest statute provides a greater level of recovery than a post-judgment interest statute. And what are the equities here in your view that require the use of a later date? The absolutely unequivocal policy of circuits across this country that a plaintiff, which is a prevailing party, should receive as complete and a remedy as possible, which means they are to receive the optimum of interest on the judgment they have secured. And that, now that's just one point. But in Scott's, they were choosing between multiple judgments. And I agree with you that Scott pretty clearly considered equities. And even though we had said ex-ante that we didn't think that the circuit was going to consider to follow its equity-based approach. I mean, I agree with you on all of that. But the one difference to me seems to be in Scott, the initial judgment and the later judgments changed with regard to the underlying amounts that the parties were entitled to vis-a-vis the actual verdict amount. Not changes about how much pre-judgment interest or post-judgment interest should be ascertained. But it was clear in those cases that a portion of the jury verdict relating to incentive compensator was later stricken by the district court. And that was the basis for the later entered judgment, was the later judgment changed entirely the underlying amount that was the subject of the pre-judgment interest. Why isn't that a significant difference from this case, where the underlying amount the jury awarded has never altered one iota throughout many lengthy years of this litigation? Well, I think on a purely equitable basis, our case is stronger. Our judgment amount has been the same from day one. In the Scott's case, it was actually remitted back and reduced for the plaintiff. We are entitled to full compensation from the very first date that we secured our verdict. The defendants have pursued almost four years of appeals in this case. Four years of appeals. And the Scott's case says that the policy here is to provide the prevailing party with an optimum recovery, which is to provide them with the fullest measure. Well, the question is whether that's consistent with Kaiser. Because Kaiser said that the standard is meaningfully ascertained. And you would agree, wouldn't you, that when one final judgment says you get 25 million as the underlying verdict, and the next final judgment says, no, that was incorrect, you only get 10, that certainly the pre-judgment interest couldn't be meaningfully ascertained as of the first one, because the second one changed the underlying value upon which the pre-judgment interest should be based. You would agree with that? I would agree with that. But that's a hypothetical situation. No, that's actually Scott. And that's different from this case. And let's now step back then and take that approach. Let's look through that prism. The amount of interest that would be assessed in connection with this case, well, first of all, in connection with the first judgment, there was a vacation of the original pre-judgment interest calculation and a recalculation that increased the pre-judgment interest by almost 2 million. You're talking about our case. This case right here. Yeah. In other words, there was a modification. There was a vacation of that portion of the judgment. But it doesn't go to whether the damages were meaningfully ascertained vis-a-vis the Kaiser decision. And that's what I'm trying to point you to is you're trying to avoid it because you don't like it. But Scott very clearly seems to focus on the notion that, well, you can use later final judgments not just because of the equities, but because the damages weren't meaningfully ascertained as of the earlier ones because we've changed the underlying damage award. But I don't believe that. That's not what Scott says. And it's not what AT&T says, which Scott cites with approval. What both of those cases say is that the motivating force behind selecting a later judgment, and they say it, is that because the pre-judgment interest statute provides a higher level of recovery for the prevailing party. That is the holding of Scott. That's the holding of AT&T, period. Now, I agree with you that there was another element that was at work there as it relates to the modification of the judgment. But that was not the linchpin for the decision of Scott or for AT&T. And the reason I'm resisting the notion that there has not been an alteration of the substantive damages in this case is that there was. Pre-judgment interest under state law and under ERIE is a substantive damage element. Yeah, but not under Kaiser. Kaiser looks to the underlying judgment and to determine whether the underlying judgment has been meaningfully ascertained. It doesn't take into account interest, correct? Yes, that's true, Judge. But remember that Kaiser did not involve pre-judgment versus post-judgment interest. But you can't have an overlap. The pre-judgment interest has to stop when the post-judgment interest begins, correct? Absolutely. And we must look to state law in order to determine where that stopping point is. There's no inconsistency here between... Kaiser didn't apply state law. Because it wasn't an issue in that case. You mean they made a mistake? They should have applied state law? No, it was a federal post-judgment entitlement to interest in that case. There was no state ERIE question in that case. And I'm not saying Kaiser's wrong. I'm just saying that the court's saying is that the Kaiser case has nothing to do with the case where the underlying claim is based on state law? I'm saying that the Kaiser case has nothing to do with a case where there is pre-judgment interest involved in the underlying case, which is an element of substantive damage. I think the meaningfully ascertained holding of Kaiser holds. But what I'm saying to the court is that Kaiser did not deal with this question, which is now before us, which is what is the impact on the calculation of post-judgment interest where, as we have in the Sixth Circuit, there is an absolute acknowledgment that state law governs in connection with the substantive law applicable to calculating pre-judgment interest. Absolutely applies. We must look to state law. And what does state law tell us? The transmatic case, this court said, well, there are a variety of state law cases that deal with this issue. Massachusetts and Texas. Well, that's true. And every one of those state statutes dealt with the underlying calculation of pre-judgment interest differently. Michigan, its highest court, states that you must calculate it throughout the appellate period. And that is fully reconcilable with 1961. It simply says state law must be, first of all, acknowledged to govern with respect to pre-judgment interest. It's calculated throughout the appeal period. Post-judgment interest commences after that date. And I think it would be an error to overlook the importance of the eerie question here, but it would also be an error to overlook the teachings of, that's a word that's used a lot in the patent case, I'm not a patent lawyer, but the teachings of Scott, which, again, the linchpin of that decision was specifically, we must select the highest interest rate available. And that was what drove their decision to select the later judgment. And that's exactly what the court said. So if I've answered your questions, I mean, I think we've covered the territory here. This is really a very straightforward issue. If this court, I hope it doesn't, chooses to reject the eerie analysis, which I think would be wrong, then it must apply the Scott's equities approach and we should be entitled to pre-judgment interest through the latest judgment that was entered in this case. And that would be the September 27, 2007 judgment. Alternatively, through operation of Rule 37B in connection with this court's mandate in 2006, at a minimum, we should be entitled to pre-judgment interest through November 29, 2006. OK. Thank you, Mr. Anding. We'll give you three minutes for rebuttal. Mr. Amir Mokri, am I pronouncing that right? Yes, you are, Judge Dike. Good morning. Good morning. I'm Cyrus Amir Mokri. I obviously represent AutoLeave. And I thought in light of Mr. Anding's remarks and the questions from the bench, I'd start with the question, Judge Probst, that you posed as to whether this fact of the judgment interest order having been issued non pro tonque was known throughout the litigation. Not only was that obvious on the face of the judgments, but also I'll just read something from page 289 of the appendix for you. This is the memorandum that Judge Cohn issued in connection with the amended judgment in April of 2004. And this is where the award of pre-judgment interest was made upon Venture's motion. And in paragraph 2, he states that following the status conference on January 15, 2004, which is obviously after the initial judgment was entered in December of 2003. And I'm skipping a little bit. Plaintiffs filed a brief-styled supplemental brief in support of plaintiffs' motion to amend judgment. The brief was accompanied by a calculation of pre-judgment interest of a certain amount as of December 4, 2003. So this is a brief that Venture itself submitted to the district court calculating pre-judgment interest after the date the original verdict was entered as judgment, calculating pre-judgment interest to the December 03 date. And so- It strikes me as pretty questionable that you can stop the running of pre-judgment interest by entering a non-proton judgment. I don't know what authority there is for that. Are you able to cite any? Well, I think the authority, Judge Teich, is really, it's consistent with federal law following Kaiser Aluminum. And that is- Well, that really doesn't- I mean, that Kaiser Aluminum speaks to the judgment. It doesn't speak to the jury verdict. I mean, under the non-proton theory, the judge could say, well, I think I'm going to make this judgment non-proton to the date of the filing of the complaint or two years before the filing of the complaint. I don't understand where you would get the power to do that. I appreciate that, Judge. However, Judge Teich, however, as a factual matter, the jury verdict was entered as a judgment on December 4 of 03. So it was an existing judgment. And then under state law, there was entitlement to pre-judgment interest. What do you mean it was entered as a judgment? Is there a piece of paper? Yes. Where is that? So it's cited in our brief, but in the appendix, it is on page 288. It's a judgment in a civil case, December 4, 2003. And so what was- So you were just referring to 289. That's his memorandum in order under pre-judgment interest, which post-dated then the judgment? Yes, because after a status conference on January 15, a post-trial conference, Venture wanted to submit its calculation of pre-judgment interest, which it did. It was entitled to pre-judgment interest under state law. And so the only question was calculating the pre-judgment interest on the verdict amount. Okay. So you don't need to rely on the non-pro tunk language that comes later because there actually is an actual judgment entered by the district court contemporaneous with the jury verdict. That's exactly right. That's exactly right. The non-pro tunk was simply a realization of what actually existed and also consistent with section 1961. It's a kind of an acknowledgement that damages were meaningfully ascertained at that point, that point being December of 03. What about Scotts? Scotts. I would prefer in Judge Moore's interpretation of Scotts. I think Scotts is very much reconcilable with the previous cases and to the extent that my friend, Mr. Anding, is arguing that it exalts the equities approach over an initial determination of when and whether damages were meaningfully ascertained. I think that would bring Scotts in conflict with the and the long line of Sixth Circuit authority that's cited in Pransmatic and interpreted in Pransmatic. Well, Kaiser wasn't distinguishing between multiple judgments. Kaiser was saying you can't use the jury verdict. It's not actually a judgment. You have to use the judgment. So I mean, it's hard for me to appreciate that Scotts is completely wrong, though obviously our earlier opinion thought that they were going a different way. But it's hard for me to appreciate that they were being, in this opinion, inconsistent with Kaiser by again considering the equities. Are you? No, no, no. I'm not saying anything different. I'm saying that an interpretation that would say that you would begin with an equities analysis regardless of whether damages are meaningfully ascertained, which is what I understand Venture to be arguing, that would be inconsistent. So here's your one problem about Scotts, which I think opposing counsel alluded to, but I'll make more explicit, which is I agree. I mean, the way I represented the facts are true. There were earlier judgments prior to the reduction of the jury verdict. And then the problem is there were actually multiple judgments after that time, at least two. After May 16, 2002, which is when the jury verdict was altered, there was a September 30, 2002 amended judgment and a September 22, 2003 final amended judgment. The problem is neither of those actually changed the underlying amount. Neither of these judgments were entered because of the jury verdict that had been taken care of earlier. And yet the Sixth Circuit chose the later of those based on what I can see is nothing other than what counsel accurately represented as a discussion of the equities. And so I'm struggling. I mean, I asked him a number of tough questions, but he responded well. And they are, when you choose between multiple final judgments that don't change the underlying award, why did the Sixth Circuit adopt the later one? Well, I don't know, but I'm bound by them, aren't I? Well, I think obviously this court is bound by the Sixth Circuit's law. However, I think that to the extent that you're construing the Sixth Circuit's decision in Scotts to depart from the analysis in cases like Caffey and Scalco and the long line of cases where when there is a conclusion that damages are meaningfully ascertained by an unchanging underlying, which in this case, there's no question about that. I think that it's important to recognize that authority. In terms of Scotts, I think you're right that the record is a little less than clear in that case. And Judge Cohn, who sat on that panel, who also has presided over the district court proceedings in this case, seemed to indicate in his opinion that, at least in his view, damages in that case had not been meaningfully ascertained until the last judgment and that September 22nd. That's right. Why is that true? Because I understand the Sixth Circuit's basis for rejecting the district court's date based on the Kaiser analysis, but I would have thought that under the Kaiser analysis, one would have selected September 30th, 2002. Am I wrong about that? Well, I think you're pointing to something that is unclear in the Scotts' opinion, and it's not really explained why, because there is a statement. But isn't my statement correct that the September 30th, 2002 judgment would be more consistent with the Kaiser analysis than the later date, which they actually chose? Yes, with the following caveat. And that is, the procedural history indicates that there had been a number of cross motions going on, directed at the underlying verdict, that the judge had also inexplicably chosen one of the prior orders, I think the first judgment, as the relevant judgment. And so the state of the record in that case is somewhat murky. That can't be said, I don't think, Judge Dyke, about the state of the record in this case, and how it lines up very clearly with the other precedent in the Sixth Circuit, which obviously Scotts, under the law of the circuit rule, could not undo. Cases such as Caffey and associated general contractors and others. So what I would say is that looking at Scotts, the methodology that it introduces, it's clear that the first step has to be a determination of whether damages were meaningfully ascertained. There is a clear methodology to do that under Kaiser Aluminum and a long line of Sixth Circuit authority. Now, whether in a particular case, the record turns out to be a little more murky, that's not our case. So on this record, certainly I would... Okay, I have a question for you related to your waiver argument. Sure. It's going to get kind of confusing. Let's see if you can follow me. Okay. You argue that they waived the right to appeal complaining about the December 4th date because it has always been and always was, and they didn't appeal it last time they were here, so they've lost their chance. Is that correct? Yes. So did you make that argument below to the district court? Yes, we did. You did? Yes. Okay. Yes. And why, in your view, didn't he buy that argument? I don't know the answer to that, Judge Probst. All I can say is that in his analysis of the equities, when he discussed Scotts, and Judge Cohen goes through an analysis of what he thought the record was and how he thought it was different, and at the end of that discussion, he has, and I believe this is the last page of the memorandum that he issued, there's a discussion of whether or how the equities in this case stack up. And Judge Cohen is quite clear that given the history of the litigation in this case, and going back to the question that you posed first of Mr. Anding, as to the fact that this has been known throughout the litigation, those were the reasons why he thought that the equities did not favor venture. And so, to me, that's a different side of the same coin of the waiver argument, however you would like to look at it. When you briefed that issue to him, did you discuss FTC versus Honeywell? Are you familiar with that case? I'm not familiar with that case, and I do not recall that we discussed that case. It's a Supreme Court case that seems to suggest that when you're appealing from a judgment, you have to appeal from the earlier judgment unless the amended judgment changes the earlier judgment in some respect. Right. Well, that's consistent with certainly some of the cases that we've cited that use a kind of a law of the case rationale, that is, if you don't appeal the issue that's in the first judgment, and then you want to appeal it later on after that initial judgment has been appealed, then they interpreted the law of the case. I don't know if the same rationale is used in FTC versus Honeywell, but that would certainly be the idea. Unless the court has any other questions, I would certainly urge that you affirm Judge Cohen's order. Thank you very much. We're going to give Mr. Anding three minutes. Thank you, Judge. First, the non-protunct. Non-protunct is to function to not to change history, but merely to correct something in the record. The issue of the demarcation between pre and post-judgment interest was never argued, never framed, or never briefed. The notation that creates this non-protunct reality is simply that, a notation that appears below the date of the order, in which the court incidentally says December 4, 2003, non-protunct December 4, 2003 for purposes of computing judgment interest. But there was a judgment on December 4. There was. And all the April judgment entered non-protunct was to simply add the pre-judgment interest that it accrued up through December 4, 2003. That's all it did. And the district court acknowledged itself that all it was doing in all of its orders entered in this case, let me turn to the order that was entered after the first appeal in this case, where he amended the judgment again. He said, pre-judgment interest has been recalculated in accordance with this court's judgment. Yes. It's on page 184. I have it, yes. And he gives an exact amount for the jury verdict. He gives an exact amount of the judgment he's entering for pre-judgment interest, an exact amount of cost. And then down below, he explains that he used December 4, 2003, to compute the interest. Now, you knew this amount because, in fact, this was the amount you all had proposed to him. So you knew clearly this amount was tied to an end date for pre-judgment interest calculation of December 4, 2003. I agree with that, Judge. And this was part of his April 7, 2004 judgment, which you then appealed to us. Yes. But you didn't appeal the calculation of the pre-judgment interest. You're telling me now that that's wrong, that this pre-judgment interest on April 4, 2004 shouldn't have been correct. It should have gone through at least April 7, 2004. No. We only proposed to the judge, for purposes of amending its original judgment, that he add the pre-judgment interest through the date of the original judgment, for purposes of calculating. But then he entered a second judgment, this amended one, on April 7, 2004. And you can see that the only pre-judgment interest he has awarded you is the interest through December 4. Because that's all we asked for at that point. And it came up on appeal to us. And you didn't appeal the notion that he didn't give you interest up until the judgment date of April 7, 2004. You seem satisfied that he gave it to you through December 4, 2004. Because it wasn't an issue. All we were doing was trying to take the jury verdict and add the amount of- It was your obligation to make it an issue if you had a problem with it. If the judge said what you didn't, but then now you do. So why is it a way? No, no, no. It's only a retrospect that we're now looking back and suggesting that something happened here that didn't happen. We proposed a number for him to enter through December 4, 2003, because that was the date of the jury verdict. And he had asked counsel to provide him with calculations. It's the amount of interest that accrued through the jury verdict. I don't think that Judge Moore is suggesting that you agreed necessarily to the December 4 date. But that knowing that he was using the December 4 date, you appealed in the first appeal and challenged the start date for prejudgment interest. But you didn't say anything about challenging the end date. So how is it that you can now, years later, argue that you shouldn't have appealed that at the time? Because it wasn't determined that that was the end date. We never asked for him to determine that it was an end date. He never found that it was the end date. No one argued that it was the end date. And that's evidenced by the fact that in October of 2006, he endorses our calculation of prejudgment interest through that date, which is Appendix 193. The issue was never before the court. We were simply giving him a calculation to allow him to bring the judgment as of the date of the verdict up to a point where it reflected both the verdict amount and the prejudgment interest amount. That's all we did. He never decided anything about the line of demarcation. So you're saying that when you came up here the first time and you were challenging the start date for prejudgment interest, in your mind then, was the end date still up in the air? Absolutely. No one was talking about it. No one had even raised the issue. Yeah, that might be our problem. No, no, no. I don't mean it that way. I don't mean it that way. What I mean was that the issue was not framed as an issue. We were simply identifying the prejudgment interest to be calculated through the date of the jury verdict, which is what the court asked for. The defendant didn't provide a contrary calculation. He entered the order. But he told you what the end date was. No, he didn't. There's nothing in this order that says that. Nothing. It simply says as of. And in fact, if you look at his opinion, which he issued that is now on appeal here, the best that he can say in his opinion is, non-protempt clearly implies the dividing line for pre- and post-judgment interest. That's the best he can say. Because Judge Cohn is a wonderful man. I've known him many years. He knew that issue had not been framed and decided. And let me now finish with a reference to I think we're out of time, Mr. Andeg. Thank you. Thank you. All rise.